(170 App. Div. 17)

## MURRAY v. NEW YORK TELEPHONE CO.

(Supreme Court, Appellate Division, Fourth Department.   November 17, 1915.)

1. TELEGRAPHS AND TELEPHONES ⊂⇒33—RIGHTS OF SUBSCRIBERS—HOW DETERMINED.

The contractual rights of subscribers for telephones must be determined primarily from the grants of franchises to the company, depending upon the wording therein, unless it is ambiguous.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ⊂⇒33.]

2. TELEGRAPHS AND TELEPHONES ⊂⇒33—REGULATION—CHARGES.

Defendant telephone company's predecessor received a grant in 1887 to operate a telephone line which required the installation of the most modern and improved instruments and appliances, and provided that for a certain class of service the rate for a single ground return line for a period of six years from 1887 should be $48 per year.  At the expiration of that period the rate was increased for metallic circuit to $100.  In 1897 defendant reduced that rate to $80, and received a further grant to put its lines underground upon condition that it should not thereafter raise its rates.  The plaintiff seeks to require the company to furnish him telephone service at the rate of $48.  *Held*, that the original grant had no application after the six-year term, that the condition of the grant of 1897 that the rates should not be raised did not apply to the original rates, but to the rates then in force, and that he could not require the company to furnish the metallic circuit at the original rate of the 1887 grant.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ⊂⇒33.]

3. TELEGRAPHS AND TELEPHONES ⊂⇒33—REGULATION AND OPERATION—DUTY TO FURNISH SERVICE—KIND OF SERVICE REQUIRED.

Defendant telephone company in 1887 received a grant requiring it to furnish the most modern and improved service possible.  At that time it furnished a ground return service.  Thereafter the increase in use of phones and other electrical appliances rendered it necessary to supplant the ground return by the metallic circuit system.  The plaintiff seeks to compel the company to furnish him a ground return system at the rate of the original grant.  *Held*, that he cannot demand such a system; it being contrary to the terms of the grant, which required the most modern appliances for the conduct of the business.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ⊂⇒33.]

4. TELEGRAPHS AND TELEPHONES ⊂⇒33—REGULATION AND OPERATION—PUBLIC SERVICE COMMISSION—NECESSITY OF APPEAL TO.

Under Laws 1910, c. 673, the Public Service Commission was given general supervision and control over telephone and telegraph companies. Public Service Commissions Law, § 92, requires phone companies to file with the Commission schedules of rates, and prohibits the charging of different rates than those specified in the schedule.   Section 97 confers upon the Commission jurisdiction to determine the tariffs which may be charged.   The plaintiff ignored the Commission, and brought his action directly to the courts.   *Held*, that he could not recover for alleged illegal charges without an appeal to the Commission, from whose decision, if discriminatory, he could appeal to the courts.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ⊂⇒33.]

5. TELEGRAPHS AND TELEPHONES ☞33—REGULATION AND OPERATION—CHARG-
    ES—PRESUMPTIONS.

 The filing of telephone tariffs, as required by statute, with the Public
Service Commission, gives those tariffs a presumption of fairness, which
is conclusive until the same are actually reformed or modified by the
Commission.

 [Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig.
§ 21; Dec. Dig. ☞33.]

Appeal from Special Term, Onondaga County.

Action by Dwight H. Murray against the New York Telephone Com-
pany. From a judgment (81 Misc. Rep. 636, 143 N. Y. Supp. 534) for
plaintiff, permanently enjoining defendant from removing a telephone
and compelling it to continue service at a stated rate, defendant ap-
peals. Reversed.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAM-
BERT, and MERRELL, JJ.

William Nottingham, of Syracuse (Charles T. Russell and Robert
F. Janes, both of New York City, on the brief), for appellant.

Walter W. Magee, of Syracuse (Ray B. Smith, Frank Hopkins, and
William Rubin, all of Syracuse, on the brief), for respondent.

LAMBERT, J. This action in equity seeks to regulate the charge
to be made by the defendant for service and the kind of service to be
furnished to plaintiff over defendant's telephone lines in the city of
Syracuse. Although in form relating merely to the rights of one in-
dividual, the questions involved are of public importance.

A predecessor company of the defendant in 1887 took a franchise
or permit from the city of Syracuse for the installation, operation, and
maintenance of a telephone system in said city. Such grant evidences
great care in its preparation, and among its many features are to be
found two paragraphs thereof, most pertinent to the questions here
presented. It is written therein:

 "Said company shall proceed without delay and with all reasonable energy
and dispatch to construct and equip a suitable and adequate telephonic plant
in and for the city of Syracuse, and furnish all its customers and patrons
therein with the most modern and approved instruments and appliances for
prompt, efficient, and satisfactory telephonic communication."

And further:

 "For a period of six years from and after February 1, 1887, unless said
company shall in the meantime be required by law or municipal ordinance
to put its systems of wires underground, the total annual charge and ex-
pense to each customer or patron of said company within said city for one full
and complete set of instruments, with a separate and independent wire from
the central office to each customer or patron, and for unlimited use for all
communications within the boundaries of said city, shall not in any case ex-
ceed the following sums, payable quarterly in advance, viz.: [Then follows a
schedule of rates which, so far as the plaintiff in this action is concerned,
made his rate $48 per year.]"

Under this grant a system was installed of the character commonly
known as a ground return. That kind of telephone system was then
the most approved, and in fact about the only, kind in use. Its essen-
tial characteristic was that but a single wire connected the subscriber
with the central office, and the circuit of electrical communication was

completed by grounding both ends of the wire and thus securing the return circuit through the earth. At such time this class of service was reasonably adequate and was regarded as practicable. The great developments in recent years in the use of electricity for various public utilities, the construction and operation of electric car lines and high power transmission lines and similar appliances, rendered this class of service less satisfactory. The grounded lines became disturbed and noisy, by reason of other electrical currents in proximity thereto, and the signaling appliances at the central office became unreliable and the service subject to greater or less interruption.

The exigencies of this situation brought greater development in the telephone service, resulting in an entirely different system, where both sides of the electric circuit between the subscriber and the central office were carried upon metal wires as to which there was no direct ground connection. This system has demonstrated its effectiveness under the modern conditions, and it is the system which to-day is in almost universal use in urban communities. It has also proven of much greater facility in long-distance communications. In fact, under modern conditions, it is almost impossible for the subscriber upon a grounded line to hold satisfactory communication for long distances.

The efficiency of this developed system gradually brought about its adoption in the city of Syracuse. In 1893 the change had so progressed that in that year the board of directors of the telephone company adopted a schedule of rates fixing the so-called single party service upon the metallic circuit at $100, and upon a grounded line at $48. In July, 1897, the telephone company made a reduction to $80 for the single party service upon the metallic circuit, and in August of that year, its necessities having presented the problem of putting its wires underground, it was granted a supplementary permission by the city of Syracuse to construct its necessary subway under certain streets and public places of the city, and as a condition thereof it was in such grant provided:

"This permission is upon the further condition that the Central New York Telephone and Telegraph Company [predecessor to defendant] shall not increase their present rate for telephone service and shall furnish the city of Syracuse, free of charge, fifteen telephones, to be placed by the committee, on the city hall and city property."

There has been no change made since the grant of this second permit, so far as the metallic circuit rates are concerned, except a reduction of the yearly rental to $60. Following the enactment of the Public Service Commissions Law, with its requirement that telephone companies file a schedule of their tariffs with the Public Service Commission, this telephone company has filed such schedule, and the charge which it attempts in this action to sustain is in conformity with that schedule.

The plaintiff has been for many years a subscriber of the present company and its predecessor. He has uniformly insisted that the telephone companies were powerless to exact from him a greater charge than $48 per year. As the metallic circuit superseded the old grounded lines, his system was changed, and he has for some time been getting

his service over a metallic circuit. In fact, to-day there are left no grounded lines within the city of Syracuse. The attitude of plaintiff has been consistent as to this controversy, and he now presents the clear question of the right of this telephone company to exact from him a greater rental than $48 per year for a single party service. In that connection he does not insist that his service be upon a metallic circuit, but is willing to concede the right of defendant to furnish him service at $48 upon a grounded line. The defendant declines to furnish him service other than as received by its other patrons, and declines to furnish such service at a sum less than $60.

[1] Naturally, the first inquiry is as to the precise contractual situation of the parties. Such contractual status is to be determined first and primarily from the grants themselves, and their construction must depend upon the wording of those grants, unless the same present ambiguity. The provisions of the franchise of 1887, first herein quoted, clearly indicate an intention upon the part of the city to exact the most modern telephonic plant within the city. That such is the purpose clearly expressed therein is conceded by the appellant.

[2] In so far as this grant assumes to fix the rates to be charged for telephonic service, it, by express wording, does not assume to regulate them beyond February 1, 1893. This paragraph of the grant commences with the expression, *"For the period of six years from and after February 1, 1887."* Embodied in this provision is some indication that the fixing of the rate had reference only to the general type of system then in use, for it is therein written: "For one full and complete set of instruments *with a separate and independent wire from the central office to each customer.* * * * * "

It may be argued with considerable force that the limitation of rate therein provided was intended to apply only to a single wire grounded service, and therefore that there is no limitation expressed in the grant applicable to the modern full metallic circuit. However, it is not essential to refine the argument to that extent to sustain the conclusion that we herein reach. It must be admitted that this grant, upon its face, does not assume or attempt to regulate the telephone rates for the city of Syracuse after February 1, 1893.

Turning next to the supplementary grant of 1897, we find therein an attempt upon the part of the city to further regulate the rate. In this connection we prefer to concede, for the sake of argument, the ¬ight of the city to exact new conditions in this supplemental grant and to recognize the validity of those conditions. The soundness of such conclusion may lie in some doubt, but we do not find it here necessary to determine that question, and will assume the validity and binding effect of the conditions in the franchise of 1897. In this grant (quotation above) is a distinct provision that the telephone rates then in force should not be thereafter increased. We are unable to read into these provisions exclusive reference to the limitation of rates contained in the original grant. There is in this grant no indication that the reference to the "present rates" is intended to refer to the rates of 1887 for a grounded service. Read in the light of the history of the case, quite the contrary argument must prevail. After the expiration of the

six-year period of limitation contained in the franchise of 1887 and prior to the granting of the franchise of 1897, by its determinations made in 1893 and in July, 1897, a new schedule of rates had been adopted by the telephone company, continuing the old rate as to the grounded line and exacting a greater rate for use of the metallic circuit. It seems clear that the grant of 1897, in its reference to the present rates, refers to the various rates then in existence and which embodied a greater charge for the metallic circuit and the $48 charge for the grounded service.

The above conclusions necessarily result in a determination that plaintiff's contractual rights under these two franchises, arising by reason of his residence in the city of Syracuse, do not require the telephone company to furnish him service upon a metallic circuit for less than the $60 they seek to charge therefor.

[3] From the point of view of his contractual rights there then remains the single question of the contractual obligation of the telephone company to furnish the plaintiff the service upon a grounded line. In support of his contentions plaintiff adverts to the above-quoted provision of the franchise of 1887 to the effect that each customer shall be furnished a single wire connection with the central office, and argues that here is to be found direct and unequivocal agreement to that effect.

Two answers may properly be made to that argument: The same instrument containing that condition contains a further covenant that the telephone company shall equip and furnish a telephonic service by means of the most modern and approved instruments and equipment. There seems to be no dispute between counsel but that the provision for modern and approved instruments and equipment creates a continuing obligation in that particular. If that is true, then the progress and development of time would of necessity require changes and modifications, and such were the requirements of this particular telephone system. The adoption of the metallic circuit was not, therefore, a mere matter of option with the telephone company. Full compliance with its agreement required this change in equipment, a change not fully comprehended, and perhaps not even considered, when the grant of 1887 went into effect. The wise provision of this grant, looking to possible improvements in telephone systems, must be given weight and effect in a consideration of the agreement. Further evidence of such an intention upon the part of the city is to be found in the fact that the grant did not purport to regulate rates after the period of six years, and in the further fact that the paragraph containing the provision for the single wire connection is commenced with the limitation of time to the six-year period. It would seem to be the more reasonable construction of this grant to hold that it did not seek to control rates after the six-year period, nor did it seek to control the class or kind of system to be used beyond the requirement that it should be modern and approved.

The second answer to plaintiff's argument lies in the fact, which we deem established by this record, that compliance with plaintiff's demands that he be furnished a grounded service involves, not only in-

convenience to him and to the telephone company, but further invasion and disruption of the service to others. Apparently it is possible to offer to plaintiff this old and now practically obsolete form of service, and to use it in connection with the improved and modern service afforded others; but it also appears that such attempt will be coupled with disrupted and unsatisfactory service in the efforts to afford telephonic connection between plaintiff's telephone and the telephones of other subscribers. Here, then, lies a further reason of public expediency for not adopting the construction of this contract sought by plaintiff. It is true it is not necessary to resort to this reason, and that a fair construction of the grant, independently of extraneous facts, reaches the same result. However, when two constructions are possible without violation of the plain provisions of a contract, the courts should be hesitant to adopt one which tends to disrupt the service of a public service corporation to its patrons.

Our conclusion is that the grant of 1887 required the telephone company to adopt this improved service, and that after February 1, 1893, there was no restriction, as a matter of contract, upon the rate to be charged, and no restriction, as a matter of contract, against the discontinuance of the ground line service. When, later in 1897, a new restriction was created, that restriction did not reinstate the prohibitions existing prior to February 1, 1893, but merely sought to preserve the schedule of rates within the limits in existence in 1897, at the time this latter grant was made. As a matter of contract, then, the plaintiff has not established the invastion of his rights.

[4, 5] Appellant has argued that, even though the question is one of the contractual rights of plaintiff, still plaintiff may not invoke the aid of an equity court in preservation thereof, so far as the tariffs of the telephone company are concerned, except after or by means of application to the Public Service Commission. However that may be, it is clear that, except in support of contractual rights, the Public Service Commission and not the court is the proper tribunal in which to litigate the propriety of rates charged.

By chapter 673 of the Laws of 1910, the Public Service Commission of the Second District was given general supervision and control over telephone and telegraph companies, their rates, operation, and management. By section 92 of the Public Service Commissions Law, this telephone company was required to file with the Commission schedule of rates charged patrons, and the act prohibits the defendant from charging any other or different rates than as specified in its schedule. Subdivision 1 of section 97 of the same law confers upon the Commission jurisdiction to determine the tariffs which may properly be charged, and permits expressly such determination, either upon motion of the Commission or upon complaint by third party. These various provisions are similar in structure to those controlling the operations, tariffs, etc., of railroad companies, and are likewise similar to many of the provisions of the national Interstate Commerce Act. Act Cong. Aug. 24, 1912, c. 390, 37 Stat. 560.

The trend of the decisions is well evidenced in the case of Pennsylvania Railroad Co. v. Puritan Coal Co., 237 U. S. 121, 131, 35 Sup.

Ct. 484, 59 L. Ed. 867. There the court pointed out that, where attack was made upon the tariff filed, the Commission had the exclusive jurisdiction; while, when the attack is made upon the manner of the application of the tariff, as where it is charged that it is applied in a discriminatory manner, then the matter is for the courts to adjudicate, rather than the Commission. As we held in Metzger v. New York State Railways, 154 N. Y. Supp. 789, decided at June, 1915, term, such conclusion has its foundation in the assumption that the filing of the tariffs in compliance with the requirements of the statute gives to those tariffs a presumption of fairness which is conclusive until the same are actually reformed or modified by the Commission.

If, then, failing in establishing a contractual status entitling him to equitable relief, the respondent seeks to maintain his standing in this action upon the general relation which he sustains to the telephone company as one of his subscribers, he is fully answered by the suggestion that, if he has complaint to make as to the rates, he must make it before the Public Service Commission. These views necessarily lead to a reversal. The facts essential to a final determination of the rights of these parties seem to be all present in the record, and there seems to be no reason for directing a new trial.

The judgment appealed from should be reversed, with costs, and the complaint should be dismissed upon the merits, with costs, and findings appropriate to sustain the judgment thus directed should be made by this court. Settle order before LAMBERT, J., on two days' notice. All concur.