In the Matter of JOSEPH FIGARI et al., Appellants, *v.* NEW YORK TELEPHONE COMPANY, Respondent.

Second Department, July 25, 1969.

· *Alfred J. Skidmore* for appellants.

*G. Wallace Bates* (*James R. Billingsley* and *Gerald E. Murray* of counsel), for respondent.

BRENNAN, Acting P. J.   This appeal presents an important question concerning the constitutionality of a tariff filed by the respondent and approved by the Public Service Commission (hereinafter referred to as the Commission).   The petitioners commenced this proceeding pursuant to article 78 of the CPLR to compel the respondent to restore their telephone service which had been terminated for their failure to comply with the tariff in question.

The individual petitioners are representatives of the corporate petitioner, Let Freedom Ring, Incorporated, which is a non-profit corporation organized under the laws of the State of Florida.   The corporate petitioner was established purportedly " to disseminate anti-communist, anti-socialist and pro-American information, through the use of telephone tape recordings."   Each of the individual petitioners subscribed to the respondent's Sponsored Recorded Announcement Service, using telephone lines and numbers supplied by the respondent.   Every week the corporate petitioner would distribute a two and one-half minute tape recording to the individual petitioners which could be heard by any person who dialed the telephone number advertised for that purpose.

In 1965 the respondent, which is a member of the Bell Telephone System, received complaints concerning anonymous recording announcements.   The complaints originally were directed to the Federal Communications Commission which referred them to the respondent.   The gist of the complaints was that the respondent was transmitting libelous messages and that, in order to enable those libeled to ascertain the sponsor, the respondent should enact a rule which would require the sponsors to identify themselves on the recordings.   Prior to November 1, 1965 the respondent revised its tariffs to permit it to identify the sponsor on request.   At that time, proposed Federal legislation, which was never enacted, was pending. The respondent claims that that disclosure requirement became too burdensome and it therefore enacted the tariff in question (No. 800) which became effective on January 1, 1966 and, as of

1968, was in effect in similar form in 46 States. The tariff requires the individual subscriber to state his name and address on the recording. The individual petitioners refused to comply and, after notice from the respondent, their recording service was terminated, Feist's in July, 1968 and Figari's in September, 1968.

Prior thereto, on December 29, 1965, the New York Civil Liberties Union filed a complaint with the Public Service Commission, seeking to prevent the tariff from becoming effective. On March 1, 1966 the Commission dismissed the complaint and held that the tariff does not violate the Public Service Law. Thereafter, on June 9, 1966, the Commission " denied " a petition for reconsideration. In an opinion, the Commission concluded that the tariff was reasonable but refused to pass upon the constitutional question, on the ground that that was solely within the " province " of the courts.

In the instant proceeding the petitioners allege that the tariff is unconstitutional, " unjustly and unreasonably arbitrary and discriminatory " and in violation of the Public Service Law. Special Term dismissed the petition on the ground that all administrative remedies had not been exhausted and that the court could not treat the proceeding as an action for declaratory judgment since the Commission had not been made a party.

Generally, before a proceeding attacking a rule or regulation of an administrative agency will be heard in a State court, the petitioners must first exhaust their administrative remedies (CPLR 7801, subd. 1). The Commission is empowered to hold hearings concerning rules and regulations promulgated by telephone companies and may determine whether they are " unjust, unreasonable or unjustly discriminatory " (Public Service Law, § 97, subds. 1, 2; *Freedom Finance Co. v. New York Tel. Co.*, 29 A D 2d 545). All rules enacted by the respondent must be filed with the Commission and cannot be modified until " legally changed " (16 NYCRR 630.3, 630.5). The respondent contends that before the constitutional question may be adjudicated in court the other issues raised in the petition must be passed upon by the Commission. However, in the matter of the complaint by the New York Civil Liberties Union the Commission unequivocally held that the tariff provision was reasonable and did not violate the Public Service Law. Since the Commission has already expressed itself on those issues, its technical expertise on such matters is no longer required. Consequently, the only new question, other than constitutionality, upon which the Commission could express itself, is whether the tariff is unjustly discriminatory as applied to these petitioners.

Nevertheless, the cases uniformly hold that, where an attack is concentrated upon the discriminatory application of a rule promulgated by a public utility, the courts may exercise jurisdiction in the first instance and mandamus is a proper remedy (*Matter of Leitner* v. *New York Tel. Co.*, 277 N. Y. 180; *Murray* v. *New York Tel. Co.*, 170 App. Div. 17, affd. 226 N. Y. 590; *Lemoyne Arms* v. *Central N. Y. Power Corp.*, 191 Misc. 709). Furthermore, initial resort to the courts is clearly proper where only questions of law are raised (*Kovarsky* v. *Brooklyn Union Gas Co.*, 279 N. Y. 304); and, in our opinion, the issue of the constitutionality of a rule approved by the regulatory agency presents such a question (1, 4 Davis, Administrative Law, §§ 2.13, 30.09; see *Dombrowski* v. *Pfister*, 380 U. S. 479). Support for this view is found in those cases concerning the constitutionality of a zoning ordinance which hold that relief may initially be sought in the courts (*Vernon Park Realty* v. *City of Mount Vernon*, 307 N. Y. 493; *Levitt* v. *Incorporated Vil. of Sands Point*, 6 N Y 2d 269).

Consequently, Special Term had jurisdiction in the first instance to consider the constitutional question and, in the exercise of discretion, should have taken jurisdiction of the discrimination claim; and, since the issue of reasonableness has been passed upon by the Commission, the court should have considered that claim *de novo* (see Annual Survey of American Law, 1968, Schwartz, pp. 91–92). Furthermore, the learned Justice could have directed that notice be given to the Attorney-General (CPLR 1012, subd. [b]) and permitted him to intervene on behalf of the Commission (CPLR 1012, subd. [a], par. 1; CPLR 7802, subd. [d]; *Lemoyne Arms* v. *Central N. Y. Power Corp.*, 191 Misc. 709, *supra*) or ordered a severance and separate trial of the issues (CPLR 407, 1003).

While the respondent did not urge nonjoinder below, and has not urged it on this appeal (CPLR 3211, subd. [a], par. 10; CPLR 3211, subd. [e]; cf. Fed. Rules Civ. Pro., rules 19, 21, 12, subd. [b], par. [7]; rule 12, subd. [h], par. [2]), the court may raise the point at any stage of the proceedings (*First Nat. Bank of Amsterdam* v. *Shuler*, 153 N. Y. 163, 170; CPLR 1003; 2 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 1001.03). Hence, we shall now consider whether the Commission is a necessary party (CPLR 1001, subd. [a]). The primary reasons for compulsory joinder of parties are to prevent multiplicity of suits and to protect absentees who ought not to be jeopardized if they have a "material interest in the subject matter" (*Steinbach* v. *Prudential Ins. Co.*, 172 N. Y. 471, 478; *First Nat. Bank of Amsterdam* v. *Shuler*, *supra*; *Mahr* v. *Norwich Union Fire Ins.*

*Soc.,* 127 N. Y. 452; 2 Weinstein-Korn-Miller, N. Y. Civ. Prac., pars. 1001.01, 1001.05). However, where complete relief may be accorded between the parties and the absent party will not be inequitably affected, the absentee is not a necessary party (CPLR 1001, subd. [a]).

In *Kovarsky* v. *Brooklyn Union Gas Co.* (279 N. Y. 304, *supra*), the plaintiff sued for an injunction, declaratory judgment concerning a question of law, and an accounting. The Commission was not a party and the Court of Appeals held that the matter should not be remanded to it. Moreover, in *Matter of Shillitani* v. *Valentine* (296 N. Y. 161) our highest court held that the Police Commissioner was not a necessary or proper party in an article 78 proceeding to restore telephone service which had been terminated because of alleged unlawful use. There the court said (p. 164) : '' Approval of the commissioner is not a statutory condition precedent to the granting of the relief sought  *  *  *.

'' Whether or no service should be terminated or discontinued, is a decision that must be made by the telephone company. That power — as well as duty — rests with the public utility, and it may not delegate the one or avoid the other.  *  *  * But whether the action is justified or warranted must be determined by the telephone company upon the facts presented. That being so, the telephone company is the only indispensable, necessary or proper party in a proceeding such as that before us.''

The instant proceeding is not unlike *Matter of Castaways Motel* v. *Schuyler* (24 N Y 2d 120), which presented a far stronger case for finding the nonparty regulatory agency a necessary party. There the regulatory agency's consent was required by statute and the agency had rendered a decision in the matter and consented to the transaction in question, subject to certain conditions. The petitioner refused to comply with the decision and commenced a proceeding pursuant to article 78 against the Commissioner of General Services. The Court of Appeals, after first observing that it is the general policy of the CPLR '' to limit the scope of indispensable parties '' (p. 125), held that the New York State Power Authority was not a necessary party, since its interest was not '' inequitably '' affected (CPLR 1001) because it could have made no determination in law other than to give its unqualified consent. At bar the same rationale applies. Any interest that the Commission may have in supporting the constitutionality of a rule approved by it clearly is not inequitably affected, because the Commission could not even pass upon the constitutional question. Furthermore, the Commission has no interest in the subject matter involved herein.

Since there is no "order, direction or requirement of the commission " outstanding which the respondent would violate were the petitioner to prevail herein, it is doubtful that the Commission could even successfully commence an enforcement proceeding against the respondent to terminate the petitioners' service (Public Service Law, § 103; *People ex rel. Public Serv. Comm.* v. *New York Tel. Co.*, 174 Misc. 517, 175 Misc. 128, affd. 262 App. Div. 440, affd. 287 N. Y. 803). Moreover, the Commission has not been a party in proceedings to compel the telephone company to furnish service or to restore service denied or terminated for alleged illegal use (*Matter of Shillitani* v. *Valentine*, 296 N. Y. 161, *supra*; *Matter of Montario* v. *New York Tel. Co.*, 181 App. Div. 893; *People ex rel. Restmeyer* v. *New York Tel. Co.*, 173 App. Div. 132; *Matter of Cullen* v. *New York Tel. Co.*, 106 App. Div. 250; *Matter of Goldman* v. *New York Tel. Co.*, 50 Misc 2d 309; *Matter of Rosenthal* v. *New York Tel. Co.*, 141 N. Y. S. 2d 459; *Matter of Di Benedetto*, 83 N. Y. S. 2d 920; *Whyte* v. *New York Tel. Co.*, 73 N. Y. S. 2d 138; *Salter* v. *New York Tel. Co.*, 67 N. Y. S. 2d 396).

In our opinion, under the peculiar circumstances presented, the Commission is not a necessary party to the instant proceeding. Discretion as to whether service is warranted lies solely with the respondent (*Matter of Shillitani* v. *Valentine*, *supra*). Complete relief herein may be accorded the parties which in no way could inequitably affect or prejudice the Commission, since it has no material interest in the subject matter (*Steinbach* v. *Prudential Ins. Co.*, 172 N. Y. 471, 478, *supra*). Its consent or advice concerning the restoration of service is not essential and it has expressly declined to pass upon the constitutional issue (cf. *Matter of Castaways Motel* v. *Schuyler*, 24 N Y 2d 120, *supra*). Of course, once the issue of the constitutionality of the rule is judicially adjudicated, multiplicity of suits will be obviated.

Before reaching the latter problem, two other points touching upon jurisdiction require mention. Initially, it is axiomatic that the tariff of a public utility regulated by a governmental agency is efficacious only by virtue of State action (*Public Utilities Comm.* v. *Pollak*, 343 U. S. 451, 462–463; *Tinker* v. *Des Moines Ind. Community School Dist.*, 393 U. S. 503; *Powe* v. *Miles*, 407 F. 2d 73). Nevertheless, the appeal is properly before this court and not the Court of Appeals because the order is nonfinal, questions other than the constitutionality have been raised, and a rule of a public utility rather than a State statute is sought to be adjudged unconstitutional (cf. CPLR 5601, subd. [b], par. 2; N. Y. Const. art. VI, § 3, subd. b, par. [2]; *People*

*ex rel. Hirschberg* v. *McNeill,* 303 N. Y. 464; 11 Carmody-Wait 2d, New York Practice, Appeals to the Court of Appeals, §§ 71:24–71:26).

Secondly, implicit in the ruling below is the confusion attendant when one sues to test the constitutionality of administrative action — which remedy, a proceeding under article 78 of the CPLR or an action for a declaratory judgment, is proper or preferable? (See *Matter of Di Maggio* v. *Brown,* 19 N Y 2d 283; *Matter of Roosevelt Raceway* v. *County of Nassau,* 18 N Y 2d 30; *Matter of Diocese of Rochester* v. *Planning Bd. of Town of Brighton,* 1 N Y 2d 508, 520; *Matter of Strippoli* v. *Bickal,* 21 A D 2d 365, affd. 16 N Y 2d 652; *Matter of Romig* v. *Weld,* 276 App. Div. 514, 517; *Matter of Levin* v. *Haber,* 28 Misc 2d 529; *Hotel Armstrong* v. *Temporary State Housing Rent Comm.,* 25 Misc 2d 87, affd. 12 A D 2d 476; 24 Carmody-Wait 2d, New York Practice, Proceeding Against a Body Or Officer, § 145:298.)

As far as the relief requested by the petitioners is concerned, it is immaterial what the proceeding is denominated, since even in actions for declaratory judgment (CPLR 3001) the court may grant affirmative relief (*Great Riv. Realty Corp.* v. *Rector, Churchwardens & Vestrymen of Emanuel Church,* 284 App. Div. 977, affd. 308 N. Y. 973; 24 Carmody-Wait 2d, New York Practice Declaratory Judgments, § 147:32). It is not necessary to our determination herein to characterize the proceeding, since it is error to dismiss the petition, even if the petitioners have chosen the wrong remedy, as long as a cause of action is stated (CPLR 103, subd. [c]; *Matter of Lakeland Water Dist.* v. *Onondaga County Water Auth.,* 24 N Y 2d 400; *Matter of Mandis* v. *Gorski,* 24 A D 2d 181). Accordingly, we shall take the case as we find it and treat the proceeding as in the nature of mandamus (see cases cited, *supra,* concerning alleged unlawful use of telephone facilities).

We shall now consider whether the tariff violates the freedom of speech and association guarantees contained in the First Amendment (and the comparable provisions in our State Constitution [art. I, §§ 8, 9]). It is well settled that freedom of speech embodies the right to receive information and ideas, regardless of their social worth; the right to utter, print and distribute (*Stanley* v. *Georgia,* 394 U. S. 557; *Griswold* v. *Connecticut,* 381 U. S. 479; *Kingsley Int. Pictures Corp.* v. *Regents,* 360 U. S. 684). Freedom of association " includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it " and is within the penumbra of the First Amendment (*Griswold* v. *Connecticut, supra,* p. 483–

484; *Gibson* v. *Florida Legis. Investigation Committee,* 372 U. S. 539; *Louisiana* v. *National Assn. for Advancement of Colored People,* 366 U. S. 293; *Bates* v. *Little Rock,* 361 U. S. 516; *National Assn. for Advancement of Colored People* v. *Alabama,* 357 U. S. 449). "Ceaseless vigilance is the watchword to prevent * * * erosion [of First Amendment rights]" (*Roth* v. *United States,* 354 U. S. 476, 488) and these rights are to be maintained "in a preferred position" (*Saia* v. *New York,* 334 U. S. 558, 562). Of course, "pure speech" and rights closely akin thereto are entitled to the greatest protection (*Street* v. *New York,* 394 U. S. 576; *Shuttlesworth* v. *Birmingham,* 394 U. S. 147; *Gregory* v. *Chicago,* 394 U. S. 111; *Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, *supra*) and the fact that tape recordings are involved herein is of no moment, since the "First Amendment draws no distinction between the various methods of communicating ideas" (*Superior Films* v. *Department of Educ.,* 346 U. S. 587, 589 [concurring opn.]). Hence, it is incumbent upon the respondent to show a compelling *State* interest that justifies any permissible infringement upon the petitioners' First Amendment rights (*Pickering* v. *Board of Educ.,* 391 U. S. 563; *Sherbert* v. *Verner,* 374 U. S. 398; *Gibson* v. *Florida Legis. Investigation Committee,* 372 U. S. 539, *supra*; *Schneider* v. *State,* 308 U. S. 147; *People* v. *Sprowal,* 49 Misc 2d 806, affd. 17 N Y 2d 884, app. dsmd. 385 U. S. 649).

The Supreme Court has consistently held unconstitutional, in their application, statutes, ordinances and court directives requiring associations to disclose their membership lists where threats of reprisals or harassment were apparent and no vital national interest would be served by disclosure (*Lamont* v. *Post-master General,* 381 U. S. 301; *Gibson* v. *Florida Legis. Investigation Committee, supra*; *Louisiana* v. *National Assn. for Advancement of Colored People,* 366 U. S. 293, *supra*; *Bates* v. *Little Rock,* 361 U. S. 516, *supra*; *National Assn. for Advancement of Colored People* v. *Alabama,* 357 U. S. 449, *supra*; cf. Civil Rights Law, §§ 53–57; *Bryant* v. *Zimmerman,* 278 U. S. 63). These cases recognize that to compel disclosure of affiliation with groups engaged in advocacy, particularly where they espouse dissident beliefs, may constitute an effective restraint on freedom of association and that anonymity may be necessary to preserve that freedom (see, also, *Lovell* v. *City of Griffin,* 303 U. S. 444). Accordingly, in determining whether disclosure ought to be required in a given case, the court must consider possible reprisals to the author, potential social ostracism and economic pressure, and his desire to remain outside the limelight

(see 70 Yale L. J. 1084, 1106–1107, Note: The Constitutional Right to Anonymity: Free Speech, Disclosure and the Devil).

While anonymity is not accorded absolute constitutional protection (see, eg., *State of Oregon* v. *Buchanan*, 436 P. 2d 729 [Ore.], cert. den. 392 U. S. 905; *Garland* v. *Torre*, 259 F. 2d 545, cert. den. 358 U. S. 910; 82 Harv. L. Rev. 1384; 70 Yale L. J. 1084, 1124), the Supreme Court in *Talley* v. *California* (362 U. S. 60) recognized that the governmental interest requiring disclosure must be substantial. There, the court held unconstitutional a Los Angeles city ordinance which prohibited distribution of handbills that did not contain the name of the printer and the person who had caused them to be distributed. California had urged that the ordinance was '' aimed at providing a way to identify those responsible for fraud, false advertising and libel '' (p. 64). The court said (p. 64) : '' Yet the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose. Therefore we do not pass on the validity of an ordinance limited to prevent these or any other supposed evils. * * *

'' There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression.''

Recently, in *Zwickler* v. *Koota* (290 F. Supp. 244, revd. as moot *sub nom. Golden* v. *Zwickler,* 394 U. S. 103), a special three-Judge court sitting in New York declared former section 781-b of the Penal Law (now Election Law, § 457) unconstitutional. That section made it a misdemeanor to distribute handbills concerning a candidate for public office unless printed thereon were the names and addresses of the printer and the person at whose instance the bills were distributed. The court relied primarily on *Talley* (*supra*) and observed that the threat of civil damages may deter free speech. Especially apprporiate to the matter at bar was this comment: '' Government assistance to a public figure, however, in ferreting out a ' traducer ' whom he may the more readily identify and from whom he may seek civil damages as balm for his individual smart at criticism * * * weighs in the balance as too high a toll to be exacted from First Amendment freedom of expression for all '' (p. 252–253).

Our brethren in the First Department have had occasion to pass upon a statute similar to the ordinance involved in *Talley* (*People* v. *Mishkin,* 17 A D 2d 243, affd. 15 N Y 2d 671, affd. 383 U. S. 502). Mishkin was convicted for possession and publication of obscene books. Some of the counts were predi-

cated on a violation of subdivision 2 of section 330 of the General Business Law, which required "every publication" to state the name of the printer. The court held the statute unconstitutional and rejected the argument of the Attorney-General that it be interpreted narrowly so as to require the name of the printer on only obscene publications. (The section has since been amended to so provide.)

While the association and disclosure cases are instructive, none are dispositive of this appeal. However, California recently passed upon a tariff similar to the one enacted in this State (*Huntley* v. *Public Utilities Comm.*, 69 Cal. 2d 67). One of the petitioners in *Huntley* was a representative of Let Freedom Ring and the tariff in California had been promulgated by a member of the Bell Telephone System and approved by the appropriate State agency. The tariff there was less stringent, since it did not require a subscriber to state his address if it could be found in a current telephone directory. Arguments similar to those at bar favoring constitutionality were presented to and rejected by the highest court in California. The court relied primarily on the association cases and *Talley* (*supra*).

Two of the arguments for sustaining constitutionality presented here were adequately answered in *Huntley*. There, the respondent asserted that the tariff was required to protect the interests of the public. The court held that the contention lacked merit and said (pp. 75–76) : " The commission does not set forth what interests of the subscribers [general public] require the abridgment of First Amendment rights. Nothing in the record indicates that the regulation was based on a fear of defamation. Moreover, a person libeled by a recording can readily ascertain the identity of his defamer from * * * [the company's] records. If the interests of the subscribers are to identify the author of 'irresponsible' messages, then, the tariff is still an unwarranted invasion of freedom of speech. Too often the test of 'responsibility' is the degree of popular acceptance of the idea. Popularity is not a criterion for determining the boundaries of speech. Even erroneous statements are entitled to constitutional protection."

The respondent there also argued that the regulation was necessary because some callers might assume that the telephone company was responsible for the message. The court said (pp. 76–77) : " This assertion borders on the frivolous. It is very doubtful that callers would ascribe the contents of a recorded message to * * * [the telephone company]. * * * But even were there merit in this contention, the tariff would fail because of its overbreadth. * * * Obviously, the telephone

company could allay its fears by simply requiring the subscriber to state that the message was not sponsored by the telephone company.''

The court concluded that the respondent had failed to establish a compelling State interest justifying permissible infringement and observed that the telephone company's claimed need '' to disassociate itself from authorship  *  *  *  may be achieved in a manner not restrictive of First Amendment rights '' (pp. 78–79).

In the cases concerning infringement upon First Amendment rights the Supreme Court has recognized that the courts have a '' delicate and difficult task '', in balancing '' the various community interests '' and in weighing the circumstances and reasons advanced for the impairment (*Schneider* v. *State*, 308 U. S. 147, 160–161, *supra*) ; *Saia* v. *New York*, 334 U. S. 558, 562, *supra*). Hence, the court must consider, *inter alia*, who said what against whom, the State's interest in conditioning free speech, and whether the utterances are otherwise constitutionally protected (*Pickering* v. *Board of Educ.*, 391 U. S. 563, *supra*; *Donovan* v. *Mobley*, 291 F. Supp. 930, 933; cf. 35 Brooklyn L. Rev. 270, 275). Once the balance is struck in favor of the utterer, the interest asserted to sustain the encroachment must be substantial and compelling (see *Sherbert* v. *Verner*, 374 U. S. 398; *Louisiana* v. *National Assn. for Advancement of Colored People*, 366 U. S. 293, *supra*).

At bar, the utterances (see annexed appendix), which are made by members of the general public, concern public officials, public figures and matters of public importance, i.e., '' the core value of the Free Speech Clause '' (*Pickering* v. *Board of Educ.*, *supra*, p. 573). Our Court of Appeals has recognized that '' the expression of controversial and unpopular views  *  *  *  is precisely what is protected by both the Federal and State Constitutions '' (*Matter of Madole* v. *Barnes*, 20 N Y 2d 169, 174; *East Meadow Community Concerts Assn.* v. *Board of Educ. of Union Free School Dist. No. 3*, 19 N Y 2d 605, 606; 18 N Y 2d 129, 134). In the leading case of *New York Times Co.* v. *Sullivan* (376 U. S. 254) the Supreme Court held that a State may not authorize recovery for defamation where an article concerns a public official in that capacity without proof of actual malice or reckless disregard of the truth. That doctrine has been expanded to include '' public figures '' and matters of public interest or concern (*Curtis Pub. Co.* v. *Butts*, 388 U. S. 130; *Time, Inc.* v. *Hill*, 385 U. S. 374; *Rosenblatt* v. *Baer*, 383 U. S. 75; *Estate of Hemingway* v. *Random House*, 23 N Y 2d

341, 352; *Pauling* v. *National Review,* 22 N Y 2d 818; *Spahn* v. *Julian Messner, Inc.,* 21 N Y 2d 124, app. dsmd. 393 U. S. 1046. *Rand* v. *Hearst Corp.,* 31 A D 2d 406; *Garfinkel* v. *Twenty-First Century Pub. Co.,* 30 A D 2d 787; *Cole Fisher Rogow, Inc.* v. *Carl Ally, Inc.,* 29 A D 2d 423; *Gilberg* v. *Goffi,* 21 A D 2d 517, affd. 15 N Y 2d 1023; *All Diet Foods Distrs.* v. *Time, Inc.,* 56 Misc 2d 821; *Sellers* v. *Time, Inc.,* 299 F. Supp. 582 [U. S. Dist. Ct., E. D. Pa., 37 U. S. Law Week 2682, decided May 12, 1969]; *Time, Inc.* v. *McLaney,* 406 F. 2d 565; *United Med. Labs.* v. *Columbia Broadcasting System,* 404 F. 2d 706, cert. den. 394 U. S. 921; *Grayson* v. *Curtis Pub. Co.,* 72 Wn. 2d 999; *Rose* v. *Koch,* 278 Minn. 235; see Ann. 19 ALR 3d 1361, Libel and Slander).

Our Court of Appeals has held that under our right to privacy statutes (Civil Rights Law, §§ 50, 51) and our judicial reporting statute (Civil Rights Law, § 74), actual malice is a prerequisite to recovery (*Estate of Hemingway* v. *Random House,* 23 N Y 2d 341, *supra;* *Spahn* v. *Julian Messner, Inc.,* 21 N Y 2d 124, *supra;* *Williams* v. *Williams,* 23 N Y 2d 592). Moreover, the *New York Times* rule also applies to proceedings for criminal libel (*Garrison* v. *Louisiana,* 379 U. S. 64; and it is interesting to note that criminal libel [former Penal Law, art. 126] is no longer a crime in this State [but cf. Penal Law, § 155.05, subd. 2, par. (e); Penal Law, § 240.30, subd. 1, added by L. 1969, ch. 290]). While defamatory statements made with actual malice are not constitutionally protected (*Garrison* v. *Louisiana, supra,* pp. 73, 75; *Beauharnais* v. *Illinois,* 343 U. S. 250, 266; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572; cf. *Pickering* v. *Board of Educ.,* 391 U. S. 563 [n. No. 5, p. 573], *supra*), the trend of the cases is to afford greater liberality in the speech arena concerning matters of public importance; and special damages must be alleged to state a cause of action in defamation where the statements are not defamatory per se (see, e.g., *Nadrowski* v. *Wazeter,* 23 N Y 2d 899; *Danko* v. *Woolworth Co.,* 29 A D 2d 855; *Klein* v. *McGauley,* 29 A D 2d 418; *Cole Fisher Rogow, Inc.* v. *Carl Ally, Inc.,* 29 A D 2d 423, *supra;* Ann. 20 ALR 3d 988, Defamation — Public Figures — Malice). It is increasingly difficult to establish the utterer's actual malice or reckless disregard of the truth, since it has been held that it is requisite to show that the author must have entertained serious doubts as to the truth of the statement and that neither mere failure to investigate the truth nor proof of ill will, corrupt motives and personal spite is sufficient to impose liability (*St. Amant* v. *Thompson,* 390 U. S. 727, 731–

732; *Beckley Newspapers Corp.* v. *Hanks,* 389 U. S. 81; *Garrison* v. *Louisiana,* 379 U. S. 64, *supra*; *Silbowitz* v. *Lepper,* 32 A D 2d 520). Consequently, absent proof of false statements knowingly or recklessly made, the recorded messages are entitled to the constitutional shield even if they exaggerate, vilify prominent persons and are false (see *Cantwell* v. *Connecticut,* 310 U. S. 296, 310).

Furthermore, no compelling State interest has been advanced to warrant the identification requirement. The regulation is not limited to defamatory statements and we are not referred to any significant legislative history evincing such an interest (*Talley* v. *California,* 362 U. S. 60, *supra*; *People* v. *Mishkin,* 17 A D 2d 243, affd. 15 N Y 2d 671, affd. 383 U. S. 502).[1] Even defamatory content, as we have seen, is constitutionally protected; and regulatory measures, no matter how subtle, cannot impinge on First Amendment rights where only a colorable State interest is advanced in support of the regulation. That the interest urged here is merely colorable is established by pre-*New York Times* case law which holds that public service corporations are entitled to a qualified privilege in transmitting messages libelous on their face and actual malice must be shown to recover in defamation (*Klein* v. *Western Union Tel. Co.,* 257 App. Div. 336, mot. to withdraw app. granted 281 N. Y. 831; see *Cheatum* v. *Wehle,* 5 N Y 2d 585, 599 [concurring opinion]; 35 N. Y. Jur., Libel and Slander, § 94). Furthermore, this State has no compelling subordinating interest in uncovering authors of defamatory matter so as to aid potential plaintiffs (*Zwickler* v. *Koota,* 290 F. Supp. 244, *supra*; cf. *Talley* v. *California, supra*; *People* v. *Mishkin, supra*). Conflicting private interests must give way to permit unhampered discourse on issues of public importance (see 82 Harv. L. Rev. 926, 929).

The only other reason set forth by the respondent to sustain constitutionality is the burden allegedly imposed upon it to reveal the sponsor's identity. This is not a public or State interest but, rather, it merely goes to the rate charged for the recording service. Even if the claim had merit, the respondent has failed to adduce any proof concerning its burden; nor does

1. In October, 1965, bills were introduced in the Federal Congress (H.R. 11605, S. 2693, S. 2713; 111 Congressional Record, pp. 27056, 27915, 28103) which would require a subscriber to " identify " himself on the recording. The proposed legislation was never enacted apparently because the Bell System Companies voluntarily filed tariffs requiring such identification. Neither counsel nor judicial research or other efforts has adduced a scintilla of evidence concerning Congressional intention in proposing these bills.

it claim a diminution in profits. As a matter of fact, the petitioners are charged the business rate rather than the ordinary domestic use rate.

Accordingly, we are of the opinion that the tariff is unconstitutional per se. '' Free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. * * * The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says '' (*Tinker* v. *Des Moines School Dist.,* 393 U. S. 503, 513, *supra*).

While the utilization of the '' third-party technique ''— publication of interest group propaganda under the guise of a supposedly impartial organization — is to be deplored, nevertheless, it is often the advocate of change, and not the purveyor of defamation or pernicious beliefs, who is deterred by disclosure requirements. We do not purport to pass upon the intrinsic validity of the statements expressed by the corporate petitioner, but it is self-evident that, for society to choose wisely among the best views, all ideas must be made available without restriction (*Red Lion Broadcasting Co.* v. *Federal Communications Comm.,* 395 U. S. 367). On a balancing of interests, democratic government is best served when citizens may freely speak out on questions of public concern, even if thereby some individual or organization be wrongfully calumniated (*Gilberg* v. *Goffi,* 21 A D 2d 517, 527–528, affd. 15 N Y 2d 1023, *supra*).

In short, we say today that a regulation which has the effect of deterring freedom of speech, not supported by any substantial governmental interest, is unconstitutional, especially where the speech sought to be regulated, whatever vagaries it embodies, is not defamatory within *New York Times* (*supra*) and its progeny and does not incite to riot or tend to provoke immediate retaliation (*Street* v. *New York,* 394 U. S. 576, *supra*; *Tinker* v. *Des Moines School Dist., supra*). Our heritage commands this result since the liberties guaranteed to individuals in the First Amendment are to be accorded a most liberal construction.

Two other points require brief mention. The respondent appears to argue that, even if the tariff is unconstitutional, service need not be restored, because the petitioners have no constitutional right to telephone service. The argument is frivolous and the respondent would be guilty of unjust discrimination if it could terminate service to a subscriber without valid reason, but supply service to other subscribers similarly situated. '' Speaking generally, the telephone company is bound to furnish service to all who pay its proper charges and obey its

reasonable regulations '' (*People ex rel. Restmeyer* v. *New York Tel. Co.*, 173 App. Div. 132, 133–134, *supra*; see *People ex rel. Western Union Tel. Co.* v. *Public Serv. Comm.*, 230 N. Y. 95; Public Service Law, § 91, subds. 1, 3; Transportation Corporations Law, § 28; 58 N. Y. Jur., Telecommunications, § 48).

The respondent's third affirmative defense alleges that the individual petitioners requested that their service be terminated and they therefore lack standing. However, the said petitioners merely requested a transfer of service to Let Freedom Ring, Incorporated, not a severance. Furthermore, service was terminated prior to the transfer (which never occurred), for noncompliance with the unconstitutional tariff.

The judgment should be reversed, on the law and the facts, with costs, and the petition granted.

RABIN, HOPKINS, MUNDER and MARTUSCELLO, JJ., concur.

Judgment reversed, on the law and the facts, with costs, and petition granted.


APPENDIX

Welcome to Let Freedom Ring of Glencove

(September 13, 1968)

Can you imagine how long America would last if the Communists got a stranglehold on our food supply. If you, the American consumer, allow the Communists to get away with their present plan to cripple the California grape industry, it may be just grapes you do without today, but meat and potatoes tomorrow.

The National Farm Workers Association, which a California investigating committee found to be under Communist control, has called for a boycott of California grapes. This illegal boycott was called because the wages of California agricultural workers are supposedly low. But the wage rate of California agricultural workers are actually among the highest in the nation and the Communist controlled National Farm Workers Association is lying to the American people.

They are getting plenty of help in this deceitful and illegal boycott from the usual collaborators, dupes and dopes in the National Council of Churches and the AFL-CIO. The objective of the boycott is far different from that assumed by the bleeding hearts among the clergy, the press, and other left wing groups.

The objective is not to help food pickers get higher wages, but Communist control of America's food supply.

Contact your food store manager and ask him for California grapes. If he is co-operating with the AFL-CIO in refusing to handle California grapes, he is probably unaware that he is sowing the seeds of his own business' destruction. Explain the situation to him and urge him not to support the boycott of any foods. Unionization of farm workers by Communist dominated unions would certainly lead to serious food shortages and disaster for America.

For more information on the Communist inspired plan to control your food supply, send 35¢ in coin to Grapes, Box 331, Glencove, New York 11542.

This week's message brought to you by the Housewives United to Protect Food Supply.

For additional information on what can be done to expose Communists' control and involvement in this secondary boycott, send your name and address to Housewives United to Protect Food Supply, 398 Deer Park Avenue, Babylon, New York 11702.

Upon completion of this message, please call two of your friends and give them our number. Remember, a new message every week and Let Freedom Ring.

May 26, 1965

A recorded woman's voice related the following when 221-6767 was dialed today in Miami, Florida:

This is Let Freedom Ring.

America has forgiven the Germans twice, and the Japanese once, but for a hundred years Northern bigots have been punishing the white Southerner who also fought and died in these wars to save our Country.

Many people thought that the Civil Rights Act of 1964 was merely another kick in the teeth for the Nation's favorite whipping boy, the white Southerner. But starting in July many of these people are going to find that the toe of the Federal boot does not discriminate as much as they thought. Northern and Western ventures may also hit the courtroom floor.

Under the provisions of the Civil Rights Act a convicted rapist applying for a job in a girls' school could file suit against the school if they requested a picture with his application, or inquired as to his country of origin. Under the Act, he could claim discrimination on the basis of color, sex or nationality. Although it sounds fantastic, you must remember that the Communists' objective is complete chaos and the tearing asunder of the very fabric of our society.

The Civil Rights Act has abolished our constitutional rights to trial by jury, and as with the Income Tax racket, you are considered guilty until proven innocent. You can be criminally indicted if the Government decides that you are even contemplating discrimination against a job applicant.

From the Fort Lauderdale News of March 23, we quote, " If all this sounds like the makings of a police state, it most certainly is. When the Federal Government is empowered to go as far as it intends to go under this Act, it makes us wonder how much longer it is going to be before Big Brother in Washington takes over everything in this Country." For a copy of the editorial on this legislative nightmare, send a stamped, self-addressed envelope to: Big Brother, Box 21, Miami Shores.

New Let Freedom Ring stations this month: Croton, New York; Calumet City, Illinois; Long Beach, California; Jacksonville, Florida; Montgomery, Alabama; Wichita, Kansas; Port Arthur, Texas; Pasadena, California; Attleboro, Mass.; Chicago, Illinois; Sacramento, California; Southern Pines, North Carolina; Birmingham, Alabama.

Thank you for calling " Let Freedom Ring." Call Monday for a new message.

September 12, 1965, as follows:

"Let Freedom Ring! The National Council of Churches has from its beginning been under the control of communists and communist fellow-travelers. Among the NCC's most vicious and anti-Christian spokesmen are Dr. Franklin H. Littel of the Chicago Theological Seminary. Littell was on the executive committee of the communist-front called the Methodist Federation of Social Action. Rev. Edward Dahlberg, former president of the National Council of Churches, has been supporting communist causes for twenty years. Dr. Harry Ward, one of the founders of the original organization called the Federal Council of Churches, has been identified under oath as a communist. But this is only a sample of the NCC's pro-Red leadership.

Let us quote from hearings of the House Committee on Un-American Activities: ' Of the leadership of the National Council of Churches we have found over one hundred persons with records of service to communist causes. The aggregate affiliations of the leadership is now, according to our latest count, into the thousands.'

With people like this in positions of power in the National Council of Churches is it any wonder that

the NCC promotes literature so filthy that it cannot be sent through the mail, and that they financed a revolutionary training school at which a convicted homosexual acted as instructor.

If your church belongs to the NCC we suggest that you make your next church pledge with the following restrictive statement: Payable within one year after date of withdrawal from the National Council of Churches.

For more information on this satanic, pseudo-religious organization send 25¢ in coin to: Church Dictatorship, in care of Let Freedom Ring, Box 1776, Oakwood, Illinois, Let Freedom Ring.''

Another illustration is a recorded message via telephone number 258-3939 in Phoenix, Arizona, on September 5, 1965, as follows:

'' Let Freedom Ring! Liberals scream loudly about separation of church and state when children bow their heads in simple prayer at a public school, but these pseudo-intellectuals are hypocritically silent about the involvement of the National Council of Churches in politics and foreign policy. The National Council of Churches is not a theological organization, but a tax-exempt political lobby. For instance, the NCC endorses the forcing of workers into labor unions by federal legislation. Have you wondered why this so-called church organization is spending your tithed money to promote this totalitarian measure? It's very simple. The National Council of Churches has become a paid political arm of Walter Reuther's AFL-CIO and in 1954 (or 1964) the Council received a pay-off of $200,000.00 from that labor organization for its cooperation in union politics. Eight years ago, the American Flag Committee of Philadelphia predicted that the communists would, in 1965, amalgamate into a powerful political coalition for the advancement of the communist conquest of America. Right on schedule, the Reuther brothers, the National Council of Churches and the communist-directed Negro revolutionary groups have coalesced into a powerful phalanx for the purpose of giving a coup de grace to the United States. of America. Dr. Eugene Carson Blake, of the National Council of Churches, said, in 1964, and we quote: ' With prudent management, the churches ought to be able to

control the whole economy in the predictable future.'
Where are the liberal hypocrites who wail about separation of church and state? Why do they remain silent in the face of this unholy alliance of church, communism, racial revolutionaries and Marxist labor leaders? Documentation on the communist-controlled labor theocracy plan for America is obtainable at the American Opinion Bookstore, 1812 W. Camelback, Phoenix, Arizona.''

Another illustration is a broadcast from Sarasota, Florida, on May 12, 1964, which contained the following:

''Let Freedom Ring!  *  *  *
Another fact ignored by the press is that the communist-lining National Council of Churches is openly promoting bloodshed through armed revolution by Negroes. There is documented proof that Negroes are being armed for open revolution this summer.  *  *  *
We urge our listeners to send a dollar donation to Box 645, Sarasota, Florida, for our civil rights packet and we also urge our listeners to purchase a rifle or pistol for home defense. We are not—we repeat, we are not promoting insurrection as does the National Council of Churches. We are merely urging you to exercise your constitutional and God-given right to protect yourself and your loved ones.''

Another illustration goes back to December 10, 1963. It contained, *inter alia*:

''Let Freedom Ring!  *  *  *
Supreme Court Justice EARL WARREN, who wails about hate and extremism, releases communists from jail faster than the Government can put them in.
The National Council of Churches, which consistently follows the Communist line, cries bigotry killed the President.
The United States State Department which, immediately after the assassination and without any evidence, declared to the world that Russia and Cuba were not involved.''

Further illustrations are:

'' America will soon be in a position of hopeless military inferiority to the beast of Russia because of deliberate disarmament by traitors in the Johnson Administration.'' (Jan. 26, 1965.)

"Another fact ignored by the Press is that the Communist-lining National Council of Churches is openly promoting bloodshed through armed revolution by Negroes. There is documented proof that Negroes are being armed for open revolution this summer." (May 12, 1964.)

"At the forefront in this vicious campaign against American patriots are the Communist press and the Anti-Defamation League * * * " (Apr., 1965.)

"At the University of Michigan a plan is being developed for the systematic house-to-house search of the entire United States for arms of any kind. The search is to be made by the U. S. Army by blocking off five states at a time, beginning in the western part of the country. The entire civilian population is to be disarmed by the end of 1965." (Feb., 1964.)

"How long will the American people put up with treason right in the White House itself? How long before the American people demand the impeachment of John F. Kennedy?" (Oct., 1962.)

"The Civil Rights Act will * * * turn America into a Fascist state practically overnight * * * No business; no church; no club, public or private, would be free of the evil smell of Bobby Kennedy's marshals and spies." (Feb., 1964.)