212 So.2d 408

**CITY OF BOGALUSA**

v.

**Ed MAY.**

No. 49044.

June 28, 1968.

Robert T. Rester, City Atty., for plaintiff-appellant.

Ossie B. Brown, Baton Rouge, for defendant-appellee.

FOURNET, Chief Justice.

This case is before us on an appeal taken by the City of Bogalusa from a judgment of the city court holding unconstitutional its Ordinance No. 759 [1]—forbidding the distribution of all circulars and pamphlets in the city unless they contain the identification of the distributor—on the ground it violates rights of free speech and press as guaranteed and protected by Section 3 of Article I of the Louisiana constitution and the First Amendment to the federal constitution, as contended in a motion to quash filed on behalf of the defendant; and, accordingly, dismissing the information

---

[1]. This ordinance provides that "No person shall distribute, or cause to be distributed, within the Corporate Limits of the City of Bogalusa, Louisiana, *any* printed, multigraphed, photographed, mimeographed, typewritten, or written pamphlet, circular, card, dodger, poster, or advertisement, by depositing same on the streets, or rights of way thereof, of the City of Bogalusa, Louisiana, or upon the private property of other persons, associations, organizations, committees, partnerships, or corporations, without their permission, if such does not contain the name of the person, association, organization, committee, partnership, or corporation responsible for its distribution. If an association, organization, committee, partnership, or corporation is responsible for the publication or distribution, there shall be included therein the full and correct name and address of one of the partners, or officers." The penalty is a fine of $100 and/or 90 days in jail, or both. (The emphasis has been supplied.)

charging him with violation of this ordinance.[2]

Counsel for the city contends, basically, that the guarantees of our state and federal constitutions sheltering free press and speech do not include anonymous speech and press; consequently, that the ordinance in question constitutes a reasonable regulation of the use of the city streets under its police power. As otherwise stated in the city's brief in the lower court: These constitutional guarantees "do not protect anonymous speech and the ordinance * * does no more than to require identification of one who wishes to express his views or sentiments or to distribute handbills dealing with commercial matters," "just as one who would speak from a speaker's rostrum would identify himself." It also pointed out that defense counsel concedes abuse of "constitutional freedom of speech by utterances and statements inimical to the public welfare, tending to corrupt morals, incite to crime or disturb the peace," may be punished, and the purpose of this ordinance is to "suppress nuisances and to preserve the peace and good order of the city."

The trial judge in ruling the ordinance unconstitutional very aptly observed that "The freedom of speech and of the press, as granted by the First Amendment to the Constitution of the United States, forms a part of the foundation of the government of this country. It sanctions the right of free men in a free land to think, to speak, to write, to publicize and to circulate their ideas and information freely, without censorship and without restraint. It assumes the wide exchange of free and unrestrained thought is essential for the total information of all people in the land and to the public welfare, and that it is essential to keeping those charged with governmental responsibility alert to the voice and the will of the people. It abhors the possibility of those exercising governmental authority of so regulating or restraining speech and the press that the thought, the spoken or written word would no longer be a reflection of the individual but of the governmental authority. It encourages diversity of thought. It even tolerates dissident views and antagonistic ideas. One of the strongest bulwarks of liberty, this concept of freedom of speech and of the press is a characteristic that has set the United States apart.

"The right of freedom of speech has been said to embrace two concepts, the right to believe and the right to act. The former is an absolute right; the latter is not unlimited; but only matters of great urgency justify restrictions on speech and the press and the validity of such restraint depends on the circumstances of each par-

---

2. It was also contended the city had no express authority to enact such legislation under its charter—Act No. 14 of 1914.

ticular case. This freedom yields only to abridgements that are essential to the maintenance of a civilized society, such as the recognized authority of cities or states, in the exercise of police power, to punish utterances tending to corrupt morals, incite to crime, or disturb the public peace. It has been held that where, in the interest of public order, there is regulation that results in an indirect restraint of free speech, the court must determine which of the conflicting interests warrants the greater protection under the particular circumstances. It has also been said that where this conflict arises, the problem is one of balancing the effects of the statute upon the free exercise of the right of speech as against the legislative determination that certain conduct should be restrained or suppressed. Furthermore, it has been held that for *an ordinance to be valid it must be narrowly drawn to avoid specific evils and that an ordinance couched in overly broad terms would not be sustained.*" (The emphasis has been supplied.)

Unquestionably, as the city judge points out, "the City of Bogalusa is clothed with police power and may enact ordinances prohibiting acts inimical to the public wel-

fare, tending to corrupt morals, incite to crime, or disturb the peace," the question for determination being "whether Ordinance 759 is within the authority vested in the City Council and in accord with the constitutional limitations."

In concluding the ordinance does not meet the test of constitutionality, the judge points out that Ordinance No. 759 is strikingly similar to an ordinance adopted by the City of Los Angeles,[3] which the United States Supreme Court held to be unconstitutional in Talley v. State of California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559, on the ground it was so sweeping it stifled fundamental personal liberties. The reasoning underlying such holding is equally applicable in the instant case, and we quote therefrom the following:

"The broad ordinance now before us, barring distribution of 'any hand-bill in any place under any circumstances,' falls precisely under the ban of our prior cases unless this ordinance is saved by the qualification that handbills can be distributed if they have printed on them the names and addresses of the persons who prepared, distributed or sponsored them. For, as in Griffin, the ordinance here is not limited to handbills whose content is 'obscene or

3. "No person shall distribute any handbill in any place under any circumstances, which does not have printed on the cover, or the face thereof, the name and address of the following: (a) The person who printed, wrote, compiled or manufactured the same. (b) The person who caused the same to be distributed; provided, however, that in the case of a fictitious person or club, in addition to such fictitious name, the true names and addresses of the owners, managers or agents of the person sponsoring said hand-bill shall also appear thereon."

offensive to public morals or that advocates unlawful conduct.' Counsel has urged that this ordinance is aimed at providing a way to identify those responsible for fraud, false advertising and libel. Yet *the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose.* Therefore we do not pass on the validity of an ordinance limited to prevent these or any other supposed evils. This ordinance simply bars all handbills under all circumstances anywhere that do not have the names and addresses printed on them in the place the ordinance requires. (The emphasis has been supplied.)

"There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Lovell v. City of Griffin, 303 U.S. [444], at page 452, 58 S.Ct. [666], at page 669 [82 L.Ed. 949].

   \*    \*    \*    \*    \*    \*

"We have recently had occasion to hold in two cases that there are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; N.A.A.C.P. v. State of Alabama, [ex rel. Patterson]

357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 [1499]. *The reason for those holdings was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance. This broad Los Angeles ordinance is subject to the same infirmity.* We hold that it, like the Griffin, Georgia, ordinance, is void on its face." (The emphasis has been supplied.)

For the reasons assigned, the judgment of the City Court of Bogalusa is affirmed.