**Wayne M. ALLEN et al.,**
**Plaintiffs,**

v.

**A. J. MONGER et al.,**
**Defendants.**

**George T. MOSES et al.,**
**Plaintiffs,**

v.

**S. R. FOLEY, Jr., et al.,**
**Defendants.**

**Nos. C–73–745 RFP and C–73–1012 RFP.**

United States District Court,
N. D. California.

July 11, 1975.

David Cobin, Oakland, Cal., Joseph Remcho, Charles C. Marson, American Civil Liberties Union Foundation of Northern California, Inc., San Francisco, Cal., for plaintiffs Allen and others.

Robert E. Breecker, Oakland, Cal., James L. Larson, Doron Weinberg, Stender, Stender & Weinberg, San Francisco, Cal., for plaintiffs Moses, and others.

James L. Browning, Jr., U. S. Atty., and James A. Bruen, Asst. U. S. Atty., Chief, Civ. Div., San Francisco, Cal., for defendants A. J. Monger, and others and S. R. Foley, Jr., and others.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PECKHAM, District Judge.

### FINDINGS OF FACT

1. Plaintiffs Wayne M. Allen, David R. Gibson, Norman L. Jones, Richard C. Luton, II, and Peter R. Pendleton were at the time of the filing of this action enlisted members of the United States Navy assigned to the USS Hancock (CVA–19).

**1084**

2. Prior to March 9, 1973, plaintiff Wayne Allen and Michael Ferner (another seaman) prepared a petition to Congressman Fortney Stark. The body of the petition read as follows:

> Dear Congressman Stark,
>
> We, the undersigned crew members of the U.S.S. HANCOCK, in recognition of the fact that the United States is officially no longer at war with the countries of Indo-China, and because the HANCOCK has already been in commission for 29 years, respectfully request that you ask Congress to investigate the necessity of having the HANCOCK make another West Pacific cruise.

3. The petition was drafted on board the USS Hancock. (R.T. 21.) Copies of the petition were prepared at a private place of business at no expense to the government. (R.T. 21.)

4. The USS Hancock (CVA–19) is an aircraft carrier with a normal crew of approximately 3400 persons. It was first commissioned in 1944 and, with the exception of six years following the end of World War II, has been in commission since that time.

5. At all relevant times until early May 1973, the USS Hancock was located at the Naval Air Station, Alameda, California. In early May 1973, the USS Hancock deployed for the Western Pacific.

6. On March 9, 1973, Michael Ferner made a written request to defendant Captain A. J. Monger, commanding officer of the USS Hancock, that the petition be authorized for distribution. (R. T. 22; Exh. F to Complaint.)

7. At this time plaintiff Allen intended to participate in the distribution of the petition, but decided to wait until Mr. Ferner received an answer from Captain Monger. (R.T. 22–23.)

8. On March 19, 1973, Captain Monger denied Mr. Ferner's request. (Exh. G. to Complaint.)

9. Despite the denial of his request, Mr. Ferner did circulate the petition on board the USS Hancock during his off-duty hours on the mornings of March 20 and 21, 1973. (R.T. 12–13.)

10. At about 3:00 p. m. on March 21, 1973, Mr. Ferner was ordered to report to Captain Monger to answer a charge of violating Article 92, Uniform Code of Military Justice: failure to obey a lawful order not to distribute the petition. Captain Monger found that Mr. Ferner had committed the offense charged and imposed punishment of a reduction in rating, a fine of One Hundred Fifty dollars, and twenty days restriction to the ship. (R.T. 12–13; Affidavit of Michael Ferner, Exh. J to Complaint at 3–4.)

11. On March 23, 1973, the plan of the day posted for each division on the USS Hancock contained the following notice:

> 7. Results of Captain's Mast of 21 March 1973. FERNER, M. S. HN MEDICAL Violation of UCMJ Art. 92: Failure to obey a lawful order from Captain A. J. Monger, to wit: not to circulate a petition. Awarded: Forfeiture for [sic] $150 for 1 month, reduction in rate, and 20 days restriction.

This notice was read aloud on H division, where plaintiffs Allen, Jones, and Pendleton were stationed. (R.T. 13; Exh. K to Complaint.)

12. Plaintiffs all desired to circulate this petition but refrained from doing so because of Captain Monger's denial and the punishment given to Michael Ferner. They filed the present action on behalf of themselves and all others similarly situated on May 4, 1973. (R.T. 12–13; Complaint, p. 6, ¶ 29.)

13. Since the filing of this action, plaintiffs Allen, Jones and Pendleton have been discharged from the United States Navy. Plaintiffs Gibson and Luton are still members of the United States Navy and are still stationed on the USS Hancock. (R.T. 79.)

14. Plaintiffs George T. Moses, Michael T. Gavin, Peter C. Berry, Scott R. Keller, Floyd R. Duncan were at the

time of the filing of this action enlisted members of the United States Navy assigned to the USS Midway (CVA–41). (Complaint, p. 2, ¶¶ 2–6.)

15. Sometime prior to May 1, 1973, plaintiffs Gavin, Moses, Keller and Duncan prepared a petition to members of Congress. The body of the petition read as follows:

We, the crew and families of the U.S.S. Midway, do hereby exercise our rights as citizens of the United States of America to petition Congress on the following issue. We object to the homeporting in Yokosuka, Japan of the U.S.S. Midway for the following reasons:

(1) We are freely opposed to the excessive expansion and imposition of United States military forces overseas. Homeporting the Midway in Yokosuka is another attempt by the U.S. to permanently establish its military presence in Asia.

(2) We object to the false statements made by the military that there is an *all volunteer* crew to deploy to Yokosuka.

(3) We disapprove of the government's lack of preparations in providing housing and other living accommodations to support our full complement of crew and familes.

(4) It is the right of all military personnel as citizen-soldiers of the U.S. to practice individually or collectively their rights as citizens, namely, (a) the right to free speech, (b) the right to peacefully assemble, (c) freedom of the press, and (d) the right to petition Congress.

(Exh. A to Complaint.)

16. Copies of the petition were prepared at no expense to the government at a private place of business. (R.T. 42, 57.)

17. The USS Midway (CVA–41) is an aircraft carrier with a normal crew of approximately 3500 persons. At all relevant times until September 10, 1973, the USS Midway was located at either Hunters Point Naval Shipyard, San Francisco, California, or Alameda Naval Air Station, Alameda, California. The USS Midway was scheduled to depart for the Western Pacific on September 11, 1973, at which time its home port would be changed from Naval Air Station, Alameda, California to United States Naval Station, Yokosuka, Japan. Deployment to the Western Pacific and change of home port took place as scheduled.

18. During a period of approximately a week prior to May 1, 1973, plaintiffs circulated their petition on board the USS Midway. (R.T. 67, 68.)

19. On May 1, 1973, plaintiffs became aware of Midway Instruction 1620.6, which required commanding officer approval prior to distribution of petitions on board the USS Midway. On May 1, 1973, plaintiffs Moses and Gavin wrote to Captain Foley, Commanding Officer of the USS Midway, and requested his permission to circulate their petition on board the USS Midway. (R.T. 66, Exh. B to Complaint.)

20. On May 4, 1973, Captain Foley denied the request by plaintiffs Moses and Gavins. (Exh. F. to Complaint.)

21. On May 23, 1973, plaintiffs Berry, Keller and Duncan submitted a request to circulate a petition identical to the one previously requested but for the addition of the words "and are demoralized by" to the third line of the first paragraph. Captain Foley similarly denied this request on May 25, 1973. (Exhs. E–J of the Complaint.)

22. Following the denial of their requests, plaintiffs refrained from circulating their petitions on board the USS Midway, fearing punitive action. (R.T. 28–29.)

23. Plaintiffs filed this action on behalf of themselves and all others similarly situated on June 4, 1973. The two actions were joined by the court as related cases.

24. Since the filing of this action, plaintiffs Gavin, Berry and Duncan have

been discharged from the Navy. Plaintiffs Keller and Moses are members of the United States Navy assigned to stations other than the USS Midway. (R. T. 75.)·

25. No action giving rise to this litigation occurred in or near a combat zone.

26. The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

27. Title 10, United States Code, § 1034 provides:

No person may restrict any member of an armed force in communication with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States.

28. Department of Defense Directive (hereinafter "DOD Directive") 1325.6, Section III(A), provides in substance that a commander may prohibit distribution of a "publication" through other than "official outlets such as post exchange" if he determines there is a "clear danger to the loyalty, discipline, or morale of military personnel, or if the distribution of the publication would materially interfere with the accomplishment of a military mission." Section III(G) of the same directive provides:

The right of members to complain and request redress of grievances against actions of their commanders is protected by Article 138 of the Uniform Code of Military Justice. In addition, *a member may petition or present any grievance to any member of Congress* (10 U.S.C. 1034). An open door policy for complaints is a basic principle of good leadership, and Commanders should personally assure themselves that adequate procedures exist for identifying valid complaints and taking corrective action. [Emphasis added.]

29. In addition, DOD Directive 1344.10, Enclosure I, ¶ 2, provides that any member on active duty may:

Sign a petition for specific legislative action . . . provided the signing thereof does not obligate the member to engage in partisan political activity and is taken as a private citizen and not as a representative of the Armed Forces.

30. Naval Instruction (OPNAVINST) 1620.1 is essentially the same as DOD Directive 1325.6. USS Hancock Instruction 1620.4A, which is based on OPNAVINST 1620.1 and DOD Directive 1325.6, extends the commander's power to all "printed materials." USS Midway Instruction 1620.6, the counterpart of HANCOCKINST 1620.4, extends the commander's power to "publications, including but not limited to pamphlets, leaflets, newspapers and petitions . . . ."

31. Defendants interpret the regulations set forth in ¶¶ 27–30 above as giving them the power to censor all petitions or ·other publications for circulation on board ship prior to distribution. Defendants further maintain that they may, in their sole discretion, prohibit circulation of any petition which they feel would impair the morale or discipline of a ship. (R.T. 85–89.)

32. Defendants maintain that circulation of a petition with which members of a crew might disagree is enough· in and of itself to cause disruption on board ship and therefore impair morale. (R.T. 88.)

33. Defendant Admiral Monger testified and this court finds that he might have permitted the circulation of the Hancock petition had it not "been asking for support in the form of a signature" and been directed to a member of Congress. (R.T. 156.) Defendant Monger testified and this court further finds that he might have permitted circulation of the petition well after the Hancock had been deployed, but not ·before or shortly after deployment. (R.T. 141–142.) The petition would have ‍been of

no effect after deployment. If Admiral Monger would have permitted circulation of the petition at all, it would have been in a manner and at a time when the petition would be of no effect.

34. Means were available to both Captain Monger and Captain Foley to counter any factual or other assertions made in a petition circulated among members of the crew. Such means included meeting with the crew, discussion on closed circuit television, distribution of material in the Plan of the Day or other printed matter, and orders that subordinates discuss the Captain's position with their subordinates. (R.T. 160–163.)

35. The information contained in the petitions was of the type commonly available in the news media in the Bay Area, where the ships were stationed. It contained no information or statements which were not being distributed by the news media and responsible officials including senators and other legislators. It was not libelous, obscene, classified or racially inflammatory.

36. As Captains of their respective ships, Admirals Monger and Foley exerted considerable leadership on their crews. Admiral Monger had successfully asserted the principles of racial equality on board ship and had had a substantial impact in lessening racial tensions by informing the crew that racism was not to be tolerated on board ship. (R.T. 159–160.) If either Captain had informed the crew that the free expression of differing views was not only to be tolerated, but to be encouraged in a free society, such leadership would have had a substantial impact in lessening the disruption, if any, which might be caused by circulation of a petition. (R.T. 160–163.)

37. Circulation of petitions on the flight deck while planes are being launched or landed, or in any work area while persons are on duty, or in sleeping berths other than those of the circulator, or on the mess decks while meals are being served would—because of the rela-

tively small size of the carriers—interfere or potentially interfere with the orderly functioning of the ship and may properly be prohibited by the ship's Captain. Distribution of petitions by persons while they are actually on duty constitutes an interference with their duty functions and may properly be prohibited. Face to face proselytizing by superiors might put improper pressure on subordinates. Defendants have not presented evidence from which this court finds the need for any further restriction on the right to circulate petitions to Congress.

38. Bulletin boards are available on ship on which either petitions or notices indicating the availability of petitions for signature at another place could be posted. Areas such as libraries, recreation rooms and chaplain's areas are available for direct solicitation of signatures.

39. Forcing persons to secure prior approval of petitions would have a chilling effect on the circulation of such petitions and would deter some persons who otherwise might circulate petitions from doing so out of real or imagined fear of reprisal.

40. The circulation of the petitions at issue herein would not have a substantial negative impact, if any at all, on the discipline, loyalty, or morale of the crew, nor would it interfere with the mission of the ship. What slight impact circulation might have on the morale, loyalty or discipline of the crew is outweighed by First Amendment considerations and by the positive effect it would have in encouraging the free flow of ideas and bringing problems to the surface which otherwise might be unknown to Congress.

41. Plaintiffs alleged jurisdiction under 28 U.S.C. §§ 1331, 1361, 1651, 2201 and 2202. For the reasons stated in its Memorandum and Order, August 23, 1974, the court finds that the amount in controversy exceeds $10,000, exclusive of interest and costs. The court finds that the nature of the petitions here establishes that amount. In both cases,

had the petitions not been prohibited and had Congress, the executive, or Naval officials been persuaded by petitioners to change plans for the carriers, the jurisdictional amount would surely have been saved by not incurring the costs of deploying so many thousands of men and moving their dependents.

■ While the court finds that the requisite jurisdictional amount is present in this action, the court also believes that it is time to abandon the anomalous requirement that the court examine each case in which a First Amendment right is asserted to determine whether the resulting controversy involves $10,000. First Amendment freedoms are the quintessence of free society. Without them our tangible assets, so readily measured in monetary terms, would mean little. Considering the thousands of sailors who have paid the supreme price in defense of these cherished rights, it is ironic for the Navy even to suggest that they be valued at less than $10,000. First Amendment rights are sacrosanct and should be presumed worth far in excess of $10,000.

42. Plaintiffs in each case brought suit on behalf of the class of persons on board the respective ships who desired to circulate petitions but who refrained from doing so out of fear of punishment by defendants. Plaintiffs asked that the class be certified as follows: "All members of the United States Navy assigned to either the USS Hancock, CVA 19, or the USS Midway, CVA 41, who desire to collect signatures on petitions to Congress from fellow servicemen on board the Hancock or Midway and to petition their Congressmen or women for redress of grievances." Plaintiffs sought certification of the class under Rules 23(b)(1) and 23(b)(2), Federal Rules of Civil Procedure.

■ 43. There are more than 6000 men on the combined ships. Although the number of persons on board who are members of the class will be less than the total number on board, it is fair to say and the court finds that the class is too numerous to name all members. The very nature of the chilling effect asserted here is such as to make it impossible to determine who the members of the class are. In addition, there may be members of the class who desire to circulate petitions with a different and even directly contrary content than those advocated by plaintiffs. Such members are entitled to the protections sought by this class action but might never contact plaintiffs. Plaintiffs herein are represented by counsel familiar with both military law and the First Amendment issues at stake here. Further, at least one plaintiff has already testified at trial, even though he has been discharged from the Navy. His willingness to pursue the case at his own expense, even after discharge, is evidence that plaintiffs will fairly represent the class. Finally, this litigation is being maintained in large part by the American Civil Liberties Union Foundation, an organization whose main objective is the preservation of the rights guaranteed by the First Amendment. See *Carlson v. Schlesinger*, 167 U.S.App. D.C. 325, 511 F.2d 1327, at 1335 (1975, Bazelon, J., dissenting). Under all the circumstances, the court finds that the plaintiffs will adequately represent the needs of the class. The class is so numerous that joinder of all persons is impracticable.

■ 44. The designated class is definite and specific within the meaning of Rule 23. Neither plaintiffs nor defendants can have any doubt as to who comes within its terms. There are questions of law and fact common to a determination of the issues of concern to both the plaintiffs and the class. The defendants are acting on grounds generally applicable to the class and final injunctive and declaratory relief with respect to the class as a whole is appropriate.

45. Initially the defendants argued that the court should abstain from jurisdiction under 10 U.S.C. § 938. The court agreed and abstained. Subsequently at least one of the plaintiffs in

each class pursued his administrative remedies and the initial decision of the commanders involved has been sustained by the Secretary of the Navy.

## CONCLUSIONS OF LAW

1. The actions are properly consolidated and maintained as a class action as defined in ¶ 42 of the FINDINGS OF FACT (hereinafter "FINDINGS").

2. Plaintiffs have exhausted their administrative remedies. In view of the certification as a class, it is not significant that all of the plaintiffs herein did not pursue their administrative remedies. See *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. 213, 216 (D.Colo.1970), *aff'd,* 466 F.2d 1374 (10th Cir. 1972).

3. For the reasons stated in the court's Memorandum and Order, August 23, 1974, at 4–7, jurisdiction exists by virtue of 28 U.S.C. § 1331. The amount in controversy exceeds the sum of $10,000, exclusive of interest and costs. (See FINDINGS ¶ 41.)

4. An actual controversy has arisen and now exists between the plaintiffs and the class they represent on the one hand and the defendants on the other, regarding the rights of the plaintiffs and their class to circulate petitions to members of Congress. A determination by this court is necessary and proper to resolve that controversy.

5. Plaintiffs and the class they represent have no plain, adequate, or complete remedy at law to redress the wrongs complained of herein. Suit for declaratory and injunctive relief is their only means of securing redress from defendants' unlawful conduct. Plaintiffs and the class they represent are now suffering and will suffer irreparable injury from defendants' acts and conduct. If defendants are not enjoined, they will continue to act in a manner which impermissibly interferes with and chills the First Amendment and statutory rights of plaintiffs and the class they represent. Injunctive relief is therefore necessary and proper.

6. Civil Action Nos. C–73–734–RFP and C–73–1012–RFP raise identical issues of law and virtually identical factual questions. The defendants in both actions are substantially identical and the plaintiff classes are substantially identical. It is appropriate that the two actions be consolidated for disposition.

7. Department of Defense Directive 1325.6, Naval Instruction 1620.1 USS Hancock Instruction 1620.-4A, and USS Midway Instruction 1620.6 authorize a prior restraint on the publication and circulation of petitions to members of Congress. The challenged regulations reach into protected as well as possibly unprotected First Amendment activity. The activity in which plaintiffs herein engaged is protected by the First Amendment and by 10 U.S.C. § 1034. See *CCCO v. Fellows,* 359 F. Supp. 644 (N.D.Cal.1972); *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); *Carlson v. Schlesinger,* 167 U.S.App.D.C. 325, 511 F.2d 1327 (1975). Plaintiffs and the class they represent have standing to challenge the regulations as overbroad. *Carlson, supra.* And the overbroad prior restraint is unconstitutional. *Lewis v. City of New Orleans,* 415 U.S. 130, 134, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Barenblatt v. United States,* 360 U.S. 109, 137, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

As Judge Orrick wrote recently in invalidating a similar Air Force regulation,

A law is overbroad "if in its reach it prohibits constitutionally protected conduct". *Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Even without actual prohibition, the chilling effect which inheres in overly broad restrictions in general is particularly apparent in a military setting, where petitions addressed to members of Congress are very likely to involve complaints about military policies or about the administration of military affairs by superior officers. To require that all petitions to be circulated

be passed upon first by the base commander imposes a considerable burden upon the free exercise of the First Amendment right of petition for redress of grievances.

*Glines v. Wade,* 401 F.Supp. 127, at p. 131 (1972).

 8. Even if the regulations were not void on their face, they have been applied in this case in a manner which violated the First Amendment rights of plaintiffs and the class they represent to free speech and association and their right to petition for redress of grievances. To the extent that they authorize any interference with the circulation of petitions to Congress other than that expressly stated in 10 U.S.C. § 1034, the challenged regulations are also inconsistent with 10 U.S.C. § 1034 and void as applied to the conduct engaged in by plaintiffs.

 9. Defendants may properly invoke military and civil law where appropriate to punish civilly or criminally persons who circulate defamatory, classified, obscene or racially inflammatory matter; but outside a combat zone, they may not require pre-screening of petitions nor place any other prior restraint on the circulation of petitions on board ship. *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

 10. Defendants may promulgate new regulations relating to the circulation of petitions on board ship, but those regulations must be consistent with the Findings and Conclusions herein and specifically must conform to at least the following minimum guidelines:

(a) Outside a combat zone there may be no prior restraint, or censorship of petitions to Congress. No prior approval or prior submission to a commanding officer or other official may be required. The right of the drafter and circulator of a petition to remain anonymous shall be preserved.

*Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); *Bates v. Little Rock,* 316 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

(b) Defendants may prohibit the distribution of petitions in work areas while persons are on duty in such areas. Defendants may prohibit the circulation of petitions by persons on duty or to persons on duty. For purposes of this Order the phrase "on duty" is intended to mean actually at work or at a working station and does not include persons who may be required to report for duty on short notice or those on standby duty. Defendants may also prohibit the distribution of petitions in sleeping areas other than those of the circulator. Defendants may also prohibit distribution of petitions at the mess hall during meals. Finally, defendants may forbid the circulation of petitions by superior officers in such a manner that subordinates may feel coerced into signing such a petition. Should defendants invoke this provision to forbid face to face proselytizing by superiors, they must provide some other means of permitting subordinates to sign petitions circulated by superiors, such as bulletin board notices on which the rank—or if necessary, the name—of the circulator is not given. In no event may there be any limitation on circulation of petitions to persons of equal or higher rank other than the limitations of this paragraph which apply to all circulation of petitions.

(c) The limitations on the right to petition which are authorized by subparagraph (b) are necessitated by the exigencies of shipboard life. In order to mitigate the effects of those limitations on face to face proselytizing, defendants shall permit reasonable use of bulletin boards for the circulation of petitions. Interested sailors should be given access to the bulletin board to post notices of the availability of petitions for signing or to post copies

of the petition. Defendants may regulate the length of time such petitions remain on bulletin boards to some reasonable time, not less than two weeks. The use of bulletin boards is in addition to and not in lieu of face to face contact which is not inconsistent with the limitations set forth in subparagraph (b).

(d) No other restrictions on the circulation of petitions outside a combat zone may be made or enforced without prior approval of the court. The parties may at any time return to the court to seek modification or expansion of this Order to meet circumstances heretofore not anticipated.