337 So.2d 866 (1976)
STATE of Louisiana
v.
Mose Milton FULTON.
No. 57763.
Supreme Court of Louisiana.
September 13, 1976.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Carl Parkerson, Dist. Atty., John R. Harrison, Asst. Dist. Atty., for plaintiff-appellant.
Bruce B. McKeithen, McKinley, Lacroix & McKeithen, Monroe, for defendant-appellee.
DIXON, Justice.
The defendant, Mose Milton Fulton, was charged by bill of information with having violated R.S. 18:1531 in causing to be published and distributed written material concerning a candidate for public office without identifying himself thereon. The defendant filed a motion to quash, contending that R.S. 18:1531 is unconstitutional, abridging the rights of freedom of speech and press guaranteed by the First and Fourteenth Amendments to the United States Constitution and Louisiana Constitution Article 1, § 7 (1974). The trial judge sustained the motion to quash, finding the statute overbroad, imposing an unwarranted restriction on the freedom of expression. From the ruling granting the motion to quash, the State appeals, pursuant to Louisiana Constitution Article 5, § 5(D) (1974).[1]
R.S. 18:1531 provides:
"No person shall publish or distribute or cause to be published or distributed any printed, multigraphed, photographed, mimeographed, typewritten, or written pamphlet, circular, card, dodger, poster, advertisement, or any other statement, relative to or concerning any candidate for election or nomination in any primary, *867 general, or special election to any state, parochial, municipal, district, or ward office, unless it contains the name of the person responsible for its publication or distribution. If an association, organization, committee, or corporation is responsible for the publication or distribution, there shall be included the full and correct names and addresses of all the officers and of its entire membership or shareholders.
Whoever wilfully violates this Section shall be fined not less than one thousand dollars nor more than ten thousand dollars, or imprisoned, with or without hard labor, for not less than one year nor more than ten years, or both."
The defendant is charged with having caused to be printed and distributed, approximately one week before the Monroe election for Commissioner of Finance, handbills containing derogatory accusations directed at Gerald Womack, a candidate for that office. The handbills did not contain any identification of the person responsible for their printing and/or distribution.
In Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the defendant was convicted of violating a Los Angeles ordinance that made criminal the distribution of any handbill in any place under any circumstances which did not have printed on the cover or face thereof the name and address of the person or persons responsible for the printing and distribution of the handbills. In finding this statute unconstitutional, the Supreme Court stated:
"There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression. `Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Lovell v. City of Griffin, 303 U.S. [444] at page 452, 58 S.Ct. [666] at page 669 [82 L.Ed. 949]. Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. The old seditious libel cases in England show the lengths to which government had to go to find out who was responsible for books that were obnoxious to the rulers. John Lilburne was whipped, pilloried and fined for refusing to answer questions designed to get evidence to convict him or someone else for the secret distribution of books in England. Two Puritan Ministers, John Penry and John Udal, were sentenced to death on charges that they were responsible for writing, printing or publishing books. Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. Along about that time the Letters of Junius were written and the identity of their author is unknown to this day. Even the Federalist Papers, written in favor of the the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes." 362 U.S. 60, 64, 80 S.Ct. 536, 538, 4 L.Ed.2d 559.
This court, in City of Bogalusa v. May, 252 La. 629, 212 So.2d 408 (1968), declared a Bogalusa city ordinance forbidding the distribution of circulars unless they contained the identification of the distributor unconstitutional, relying on the Talley case, supra.
The only difference between the Los Angeles ordinance declared unconstitutional in Talley and the statute in this case is that R.S. 18:1531 is limited to handbills "relative to or concerning any candidate for election or nomination." We are of the opinion that such a limitation does not save the statute *868 from the constitutional infirmities found in the Talley and Bogalusa cases, supra.
In the case of People v. Bongiorni, 205 Cal.App.2d Supp. 856, 23 Cal.Rptr. 565 (1962), the California court rejected a contention that Talley did not govern a statute that was limited to handbills concerning elections only:
"The People have cited a number of decisions from other states which would appear to be somewhat contrary to the rule laid down in the Talley case. An examination of the ordinance involved in the Talley case reveals that the only substantial difference between that enactment and Section 12049 of the Election Code is that the latter statute is confined to circulars or handbills by which it is sought to influence the result of elections, while the ordinance involved in the Talley case applied to handbills or circulars generally. It is to be noted that there is nothing in either enactment by which it is sought to define the type of statement or utterance that is prohibited.
As the enactment is worded, it would be as much a violation to issue a handbill laudatory of a candidate as one that sought to damage his reputation. This Court is unable to find sufficient distinction between the distribution of handbills generally and the distribution of handbills concerning elections to justify departure from the rule laid down by the United States Supreme Court."
In Commonwealth v. Dennis, 329 N.E.2d 706 (Mass.1975), the defendant was convicted of violating a statute which made it a crime to write, distribute, print or post anonymous circulars and posters designed to aid or defeat any candidate for nomination or election to public office. In finding that the statute was unconstitutional, the court noted, at 329 N.E.2d 706, 708:
"Although from what we have said it is apparent that the defendant's exception to the denial of his motion to dismiss the complaint must be sustained, we believe it appropriate to indicate that there are significant First Amendment problems with any statute which requires the author of a publication to reveal his identity.
In Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Supreme Court struck down an ordinance prohibiting the distribution of any handbill not containing the name and address of the person who printed, wrote, compiled or manufactured it and the person who caused it to be distributed. The court said that `[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression.' Id. at 64, 80 S.Ct. at 538. The court noted the historical importance and constructive effect of certain anonymous writings and concluded that the government did not have the right to compel disclosure in the circumstances before it. `[I]dentification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance.' Id. at 65, 80 S.Ct. at 539.
. . . . .
It seems clear that any public interest in revealing the source of a communication so that the recipient may assess its content in light of that source does not furnish a constitutionally sufficient justification for a prohibition of all anonymous campaign literature."
In People v. Duryea, 76 Misc.2d 948, 351 N.Y.S.2d 978 (1974), aff'd 44 A.D.2d 663, 354 N.Y.S.2d 129 (1974), the defendants were charged with violating a statute that made it criminal to print, publish or distribute, or to order the printing, publishing or distributing of handbills, circulars, pamphlets and the like concerning political parties, candidates, etc., whether in favor or against such, in connection with any election, without reproducing thereon the name and address of the printer and/or distributor and the person ordering the printing and/or distribution. In finding the law unconstitutional, the court stated:
"I conclude, therefore, that even granting that the compelling nature of the concern for `the integrity of political campaigns' is sufficient to permit some limitations on *869 totally free expression, this statute is not narrowly enough drawn to further the State's legitimate interest. It is in no way limited to deterring campaign defamation and financing violations. It makes anonymity a crime when anyone (candidate, political organization, private organization or private individual) prints or distributes any literature `in quantity' (poster, handbill or letter) containing any statement (reckless, responsible, political, personal, true, false, favorable, unfavorable, scurrilous or discreet) concerning any candidate (declared or undeclared) or issue on the ballot (constitutional amendment or proposition) `in connection with' any party or governmental election.
It thereby prohibits, for example, a congregant from anonymously distributing leaflets on behalf of an amendment to the State Constitution which is against the wishes of his religious sect. It prevents a group of workers from anonymously publicizing a candidate or ballot proposition unacceptable to their employer. It prevents a government contractor from anonymously criticizing the performance of its incumbent benefactor. In short it prevents anyone from anonymously propagandizing on behalf of candidates or ballot issues that the powers-that-be dislike. It deters anyone who fears retribution, whether his anxieties are justified or not, from freely expressing his positions on political matters at the crucial time of an election. Its subtle message is to conform. Toe the party line. Publicly identify yourself if you disagree. Let everyone know who you are. Otherwise be silent and abide with the status quo.
What exigent interest compels restrictions on a private individual simply handing out flyers on a street corner criticizing the performance of a candidate seeking re-election? What overriding need is there for a regulation inhibiting a group of citizens from communicating its views on the merits of a constitutional amendment or a sewer bond issue?
The District Attorney suggests that anonymity is no longer necessary, relevant or beneficial to the political process. Fear of reprisals are largely illusory now, the prosecutor claims, and anonymity is most often the vehicle of the irresponsible. Moreover, it is argued, ideas are best evaluated when their source is known. Then was Junius the last patriot when he wrote, anonymously, that we `detest the pageantry of a king, and the supercilious hyprocrisy of a bishop' (Letters, No. 35, December 19, 1769)? People are rarely beheaded nowadays, but was the regime of George III the last tyrannical establishment?
Of course, the identity of the source is helpful in evaluating ideas. But `the best test of truth is the power of the thought to get itself accepted in the competition of the market' ( Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 [1919] [Holmes, J.].) Don't underestimate the common man. People are intelligent enough to evaluate the source of an anonymous writing. They can see it is anonymous. They know it is anonymous. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is `responsible', what is valuable, and what is truth.
For the foregoing reasons, it is apparent that, assuming these defendants have the standing to raise the overbreadth issue, Section 457 of the Election Law of the State of New York must be declared unconstitutional as overly broad in that it unfairly and unnecessarily sweeps within its criminal sanctions activity that is the protected right of every citizen under the First Amendment." 351 N.Y.S.2d 978, 995.
Lower federal courts have considered statutes very similar to Louisiana's and found them to be unconstitutional. In Zwickler v. Koota, 290 F.Supp. 244, 252 (E.D.N.Y.1968), vacated on other grounds,[2] *870 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), the district court struck down the predecessor of the law subsequently struck down in People v. Duryea, supra (the laws had identical language), stating:
"Anonymity alone, according to defendant, is the touchstone of the offense, but only if perpetrated in a political environment. Government assistance to a public figure, however, in ferreting out a `traducer' whom he may the more readily identify and from whom he may seek civil damages as balm for his individual smart at criticism of his official performance weighs in the balance as too high a toll to be exacted from First Amendment freedom of expression for all. The freedom to animadvert upon public figures and affairs primes all others."
In Printing Industries of Gulf Coast v. Hill, 382 F.Supp. 801 (S.D.Tex.1974), vacated 422 U.S. 937, 95 S.Ct. 2670, 45 L.Ed.2d 664,[3] a Texas statute stating that any printed or published political advertising shall also have printed on it the name and address of the printer or publisher and the person paying for the advertising was declared unconstitutional, the court stating at page 811:
"It is also important to remember that the rights of the first amendment will be curtailed at a time when they are most vitalduring an election campaign. Surely, if the first amendment was designed to assure a free government by free men, then the political discussions of an election year are the most important of all. Yet, the State would curtail these discussions precisely at that time. That this state of affairs places a substantial burden upon the first amendment is clear to this court and needs no further elaboration."
In order to justify a restraint on protected expression, such as compulsory disclosure of the source of a political leaflet, the State must demonstrate that there is a compelling State interest in such restraint. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); National Association for the Advancement of Colored People v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). Moreover, the limitation must be no greater than is necessary to protect that compelling interest. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).
In Buckley v. Valeo, 421 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the United States Supreme Court upheld the financial disclosure requirement of the Federal Election Campaign Act. However, in doing so, the court noted 96 S.Ct. at page 664:
"Section 434(e), as we have construed it, does not contain the infirmities of the regulations before the Court in Talley v. California, supra, and Thomas v. Collins, supra. The ordinance found wanting in Talley forbade all distribution of handbills that did not contain the name of the printer, author, or manufacturer, and the name of the distributor. The city urged that the ordinance was aimed at identifying those responsible for fraud, false advertising, and libel, but the Court found *871 that it was `in no manner so limited.' 362 U.S. [60], at 64, 80 S.Ct. [536], at 538 [4 L.Ed.2d 559]. Here, as we have seen, the disclosure requirement is narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced. Thomas hold unconstitutional a prior restraint in the form of a registration requirement for labor organizers. The Court found the State's interest insufficient to justify the restrictive effect of the statute. The burden imposed by § 434(e) is no prior restraint, but a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view."
R.S. 18:1531 is not narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced. Rather, it forbids the distribution of any pamphlets and the like relating to a candidate for election unless the pamphlet discloses the name of the person responsible for its publication. As the trial judge pointed out, even a bumper sticker saying "Elect Smith" could be the basis for prosecution.
R.S. 18:1531 is incompatible with basic constitutional guarantees. We are cited to no cases where such a statute has been upheld. No substantial reason has been advanced for ignoring the uniform jurisprudence and clear constitutional provisions reprobating such statutes. Therefore, for the reasons expressed in the authorities here cited, R.S. 18:1531 must be declared unconstitutional.
The judgment of the trial court sustaining the motion to quash is affirmed.
NOTES
[1] La.Const. art. 5, § 5(D) provides:

"In addition to other appeals provided by this constitution, a case shall be appealable to the supreme court if (1) a law or ordinance has been declared unconstitutional; (2) the defendant has been convicted of a felony or a fine exceeding five hundred dollars or imprisonment exceeding six months actually has been imposed."
[2] Zwickler v. Koota was a declaratory judgment action. Zwickler had been convicted of violating the law by distributing anonymous handbills in connection with the 1964 congressional elections. His conviction was reversed on state law grounds. People v. Zwickler, 16 N.Y.2d 1069, 266 N.Y.S.2d 140, 213 N.E.2d 467. Afterward, Zwickler brought this suit to have the law declared unconstitutional. In the interval, the particular congressman Zwickler intended to criticize had left Congress to accept a position on the New York Supreme Court. The Supreme Court held this development precluded the issuance of a declaratory judgment, and vacated the judgment of the district court, noting "we accordingly intimate no view upon the correctness of the District Court's holding as to the constitutionality of the New York statute."
[3] After the district court decision in this case, the Texas legislature enacted the Political Funds Reporting and Disclosure Act of 1975, which substantially amended the statute in issue in the case. The Supreme Court therefore remanded the case for consideration in light of the new amendments.